J-A08017-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ANNABELLE GLASGOW | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| IAN DUCAN, M.D., SCOTT E. | : | |
| BARBASH, M.D., EASWARAN | : | |
| BALASUBRAMANIAN, M.D., | : | No. 2384 EDA 2016 |
| FREDERICK P. NISSLEY, D.O., | : | |
| ANJULI DESAI, M.D., MICHAEL | : | |
| BAUMHOLTZ, M.D., TEMPLE | : | |
| UNIVERSITY HOSPITAL, TEMPLE | : | |
| UNIVERSITY PHYSICIANS, MARY M. | : | |
| POMIDOR, M.D., NAZARETH | : | |
| HOSPITAL AND MERCY HEALTH | : | |
| SYSTEM OF SOUTHEASTERN PA | : | |
| | : | |
| | : | |
| APPEAL OF: EASWARAN | : | |
| BALASUBRAMANIAN, M.D., | : | |
| FREDERICK P. NISSLEY, D.O., | : | |
| TEMPLE UNIVERSITY HOSPITAL | : | |

Appeal from the Judgment entered on July 21, 2016
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 1343

BEFORE:   PANELLA, J., LAZARUS, J., and STRASSBURGER, J.*

MEMORANDUM BY LAZARUS, J.:                **FILED SEPTEMBER 25, 2018**

Easwaran  Balasubramanian,  M.D.  ("Dr.  Bala")[1],  Frederick  P.  Nissley,

D.O.  ("Dr.  Nissley"),  and  Temple  University  Hospital  ("Hospital"),

---

[1] This abbreviated name was Dr. Balasubramanian's preference, and it is consistent with the notes of testimony and court filings.  **See** N.T. Trial, 11/30/15, at 28.  **See also** Trial Court Opinion, 6/29/17, at 1 n.1.

---

*   Retired Senior Judge assigned to the Superior Court.

(collectively, "Defendants"), appeal from the judgment entered on the jury's verdict in favor of Annabelle Glasgow ("Plaintiff") in the amount of $4,573,945.00,[2] as molded to include delay damages.[3] After our review, we affirm. We rely, in part, on the comprehensive opinion authored by the Honorable Rosalyn K. Robinson.

In 2009, Plaintiff, was treating with Hospital's orthopedic surgeon, Dr. Bruce Vanette. Doctor Vanette's notes indicated Plaintiff had a history of congestive heart failure, stroke, hypertension, diabetes and decreased pedal pulse in one foot, potentially a sign of circulation issues. N.T. Trial, 12/1/15, at 55-56, 67-68;[4] N.T. Trial 12/3/15, at 92. When Dr. Vanette left the orthopedic practice, he referred Plaintiff to Dr. Bala. Doctor Bala, an orthopedic surgeon with a subspecialty in total joint replacement, diagnosed Plaintiff with degenerative arthritis in both knees; he treated Plaintiff with pain medication and injections, but ultimately those treatments became ineffective. In late 2011, Dr. Bala recommended Plaintiff undergo bilateral knee replacement surgery. Dr. Bala testified that he always checked his patients' circulation prior to surgery, but he admitted that Plaintiff's

_____

[2] The jury's verdict of $4,268,758.00 included damages for past and future pain and suffering, past lost wages, past care costs, and future care costs for ten years.

[3] Doctor Bala, Plaintiff's orthopedic surgeon, was found 40% liable. Doctor Nissley, who directed Plaintiff's inpatient post-operative care, and Temple University Hospital were each found 30% liable.

[4] We note that the cover page for the 12/1/15 trial transcript is mistakenly labeled "Tuesday, December 1, **2005**."

appointment notes do not indicate that he ever evaluated her with respect to circulation.  N.T. Trial, 1/4/15, at 66.

Doctor Bala performed Plaintiff's bilateral knee replacement surgery on December 1, 2010.  Plaintiff was 72 years of age at the time of surgery. Thereafter, Plaintiff was admitted to Hospital's acute rehabilitation unit; Plaintiff's post-operative care in the rehabilitation unit was supervised by Dr. Nissley, although Dr. Bala remained significantly involved in Plaintiff's post-operative care as well.  N.T. Trial, 12/3/15, at 99-100, 124.

For the next two years, Plaintiff suffered ongoing infections in her surgical incisions and pressure wounds.  Six weeks after her surgery, Plaintiff's surgical incisions on her right knee opened, showing infection. N.T. Trial, 12/1/15, at 25-26.  In the year following surgery, Dr. Bala performed five additional operations to revise the implantation and combat infection, in the hope of salvaging Plaintiff's knee prosthetics.  Doctor Bala did not perform wound cultures or synovial fluid biopsies during these operations, which, as testified by Plaintiff's expert, Dr. Lawrence Shall, could have been easily performed and would have determined whether the infections had become so embedded that the implants were no longer viable.  *Id.* at 73-76.  On January 7, 2011, Plaintiff underwent irrigation and debridement of the right knee; intraoperative cultures grew positive for enterococcus cloacae, a bacterial infection.  Doctor Bala could not recall if he ordered an infectious disease consultation at that time.  N.T. Trial, 12/4/15, at 79-80.

On May 31, 2011, approximately six months after the initial surgery, Dr. Michael Baumholtz, a physician in Hospital's rehabilitation unit, notified Dr. Bala that he had drained "copious amount of pus" from Plaintiff's left knee. N.T. Trial, 12/4/15, at 79. Two months later, Dr. Baumholtz transferred Plaintiff out of the rehabilitation center to Hospital inpatient care because she had a strong odor coming from her leg wound, indicating a bacterial infection. N.T. Trial, 12/1/15, at 14-15. When the cast was opened, doctors found that the infected wound tissues had again reopened and separated, leaving the knee prosthesis visible. *Id.* at 14-16. At that point, Dr. Bala informed Plaintiff that her treatment options were either a knee fusion, which would render the joint permanently unable to bend, or an above-the-knee leg amputation. N.T. Trial, 12/4/15, at 60.

Plaintiff sought a second opinion from Dr. Scott Levin at Penn Presbyterian Hospital. Doctor Levin performed several tests, which revealed considerably more obstruction of her leg circulation than Dr. Bala or the rehabilitation unit doctors had thought. N.T. Trial, 12/1/15, at 23. Doctor Levin opined that fusion was not an option and Plaintiff's only option was amputation of her left leg. *Id.*

Plaintiff underwent an above-the-knee left leg amputation at Penn Presbyterian Hospital in 2012. She underwent additional procedures the following year to re-implant the right knee prosthesis.

On February 7, 2013, Plaintiff filed her complaint alleging medical negligence and corporate negligence against Defendants. Plaintiff alleged

Defendants were negligent in: failing to properly assess her risks in light of her medical history; failing to warn her of the post-operative risks in light of her history, in particular the risk of poor wound healing/infection in light of her history of diabetes and compromised blood flow in her left lower extremities; failing to inform her that in light of her medical history bilateral knee replacement was contraindicated; and failing to timely and properly treat her post-operative infections. *See* Complaint, 2/7/13, at ¶¶ 22-70.

Following a one-week trial, the jury rendered a verdict in favor of Plaintiff. Defendants filed post-trial motions, seeking judgment n.o.v. (JNOV), a new trial or remittitur. The court denied Defendants' post-trial motions. Plaintiff filed a motion for delay damages, which was granted and, thereafter, on July 20, 2016, the court entered judgment on the verdict. Defendants filed a timely notice of appeal, and the trial court ordered Defendants to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Defendants complied with the court's order and the trial court filed a Rule 1925(a) opinion. Defendants raise the following issues on appeal:

1. Are Defendants entitled to [JNOV] since the trial court erred and abused its discretion in admitting the standard of care and causation testimony of Dr. [Lawrence] Shall in violation of 40 P.S. § 1303.512(a), (c) and (e)?

2. Are Defendants entitled to [JNOV] as to Plaintiff's claim for future care costs, since Plaintiff failed to establish the

reasonableness and medical necessity of these expenses and the trial court therefore erred and abused its discretion in submitting this claim to the jury or, in the alternative, are Defendants entitled to a reduction of the award to present value?

3. Is [Hospital] entitled to [JNOV] since there was no expert testimony establishing that the conduct of the nurses breached the standard of care or caused, or increased the risk of, harm to Plaintiff?

4. Did the trial court err and abuse its discretion in refusing to grant a complete new trial, since the jury's verdict is based on sympathy and prejudice and is contrary to the overwhelming weight of the evidence?

5. Did the trial court err and abused its discretion in refusing to mold the jury's award of past care costs, in the amount of $81,895.00, to $62,227.21, to conform to the stipulated amount of past care costs?

6. Did the trial court err in awarding Pa.R.C.P. 238 delay damages on Plaintiff's award for future care costs under 40 P.S. § 1303.509?

Appellants' Brief, at 4.

Defendants first claim that the trial court erred in admitting the testimony of Plaintiff's expert, Dr. Lawrence Shall.[5]  Defendants argue the court's admission of Dr. Shall's testimony violated sections 512(a), (c) and (e) of the Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. §§ 1303.101-1303.910, as well as Pennsylvania law governing admission of expert testimony.  Specifically, Defendants contend Plaintiff failed to meet her

---

[5] We note that Defendants objected to Dr. Shall's qualification as an expert at trial.  **See** N.T. Trial, 12/1/15, at 43.  Defendants also raised this claim in their post-trial motions and in their Rule 1925(b) concise statement of errors complained of on appeal.

- 6 -

burden of establishing that Dr. Shall was qualified to render opinions on standard of care and causation with respect to: 1) Dr. Bala's failure to remove the right knee prosthesis in February 2011 and delay in explanting the left knee prosthesis until July 2011, and (2) Dr. Bala's failure to insert a cement spacer with antibiotics when the left knee prosthesis was removed. Defendants argue that although Dr. Shall and Dr. Bala have the same specialty, orthopedic surgery, Dr. Shall's subspecialty is sports medicine, while Dr. Bala's subspecialty is joint replacement, and, therefore, Dr. Shall does not meet the "same subspecialty" requirement of the MCARE Act. 40 P.S. §1303.512(c). **See Anderson v. McAfoos**, 57 A.3d 1141 (Pa. 2012) (all three subsection (c) requirements -- familiarity with standard of care, same subspecialty, and same board certification -- are mandatory). Defendants argue, therefore, that since there was no other expert testimony, Dr. Bala is entitled to JNOV and the Hospital and Dr. Nissley are entitled to a new trial due to prejudice from Dr. Shall's testimony.

A motion for JNOV challenges the sufficiency of the evidence presented at trial. **Koller Concrete, Inc. v. Tube City IMS, LLC**, 115 A.3d 312, 321 (Pa. Super. 2015). When examining the lower court's refusal to grant JNOV, we review the record to determine whether, viewing the evidence in the light most favorable to the verdict winner and granting that party all favorable inferences therefrom, there was sufficient competent evidence to support the verdict. **Id.** "[W]here the jury has been presented with clear and convincing evidence, a motion for JNOV should be denied." **Id.**

The entry of judgment notwithstanding a jury verdict is a drastic remedy. A court cannot lightly ignore the findings of a duly selected jury. There are two bases upon which a court may enter a [JNOV]: (1) the movant is entitled to judgment as a matter of law, or (2) the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, a court reviews the record and concludes that even with all factual inferences decided adversely to the movant, the law nonetheless requires a verdict in his favor; whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Bugosh v. Allen Refractories Co*., 932 A.2d 901, 907–908 (Pa. Super. 2007).

With respect to the court's denial of a new trial, we note:

Consideration of all new trial claims is grounded firmly in the harmless error doctrine which underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake. Once the trial court passes on the moving party's claim, the scope and standard of appellate review coalesce in relation to the reasons the trial court stated for the action it took. Where the court is presented with a finite set of reasons supporting or opposing its disposition and the court limits its ruling by reference to those same reasons, our scope of review is similarly limited. Thus, where the trial court articulates a single mistake (or a finite set of mistakes), the appellate court's review is limited in scope to the stated reason, and the appellate court must review that reason under the appropriate standard.

*Rettger v. UPMC Shadyside*, 991 A.2d 915, 923–24 (Pa. Super. 2010) (internal citations and quotation marks omitted).

The MCARE Act[6] provides, in relevant part:

(a) General rule.--**No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.**

(b) Medical testimony.--An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

  (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

  (2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

(c) Standard of care.--In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

  (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

  **(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).**

---

[6] The parties do not dispute that the MCARE Act is applicable here.

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

* * *

(d) Otherwise adequate training, experience and knowledge.-- A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period**.**

(e) Otherwise adequate training, experience and knowledge.— **A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period**.

40 P.S. § 1303.512(a)-(e) (emphasis added).

The burden to establish an expert's qualifications under the MCARE Act lies with the proponent of the expert testimony. **Weiner v. Fisher**, 871 A.2d 1283, 1290 (Pa. Super. 2005). Here, the court found Plaintiff met her burden of establishing that Dr. Shall met the waiver requirement for the "same subspecialty" provision. **See** 40 P.S. § 1303.512(e). The court reasoned that Dr. Shall's "thirty years of education, experience, and teaching, and his familiarity with the standard of care to be exercised in prevention and treatment of post-operative infection" showed that he had "sufficient training,

- 10 -

experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in . . . a related field of medicine within the previous five-year time period." 40 P.S. § 1303.512(e). Trial Court Opinion, 6/29/17, at 14-15. We agree.

It was established at trial that Dr. Shall graduated from the Medical College of Ohio and Toledo in 1980, and he completed a one-year internship and four-year residency at Mount Sinai Medical Center of Cleveland in orthopedic surgery, as well as a fellowship in sports medicine at Wellington Sports Medicine Center at Christ Hospital in Cincinnati, Ohio. *See* N.T. Jury Trial, 12/1/15, at 9-11; *see also* Curriculum Vitae, Lawrence M. Shall, M.D., Plaintiff's Exhibit 58. Doctor Shall explained that sports medicine is the treatment of diseases of the knee and shoulder and involves "surgery mostly of the knee and shoulder." N.T. Trial, 12/1/15, at 11-12. He also testified that he had practiced for thirty years and had treated high-risk patients with conditions such as hypertension or diabetes. *Id*. at 9. Doctor Shall testified that he has performed both implantation and explantation procedures. *Id.* at 35. In addition to the American Medical Association, Dr. Shall testified that he is a member of the Virginia Orthopedics Society, the American Academy of Orthopedic Surgeons, the Arthroscopy Association of North America, and the American Orthopedic Society for Sports Medicine. *Id.* at 14-16. He also testified that he is on the clinical faculty of Eastern Virginia Graduate School of Medicine, *id.* at 13, serves on the staff of several local hospitals, including Chesapeake General Hospital and Sentara Combined Medical Center, *id.* at

18-21, and is published in various professional journals, including the American Journal of Knee Surgery, Contemporary Orthopedics, and the Journal of Arthroscopy. *Id.*; Curriculum Vitae, *supra*.

The trial court accepted Dr. Shall's testimony that he was familiar with the standard of care as an orthopedic surgeon in preventing post-operative complications. This determination is supported by the record.

We also point out that Defendants' focus on the subspecialty language of the MCARE Act overlooks the fact that this case is about the standard of care in pre- and post-operative surgical care, not the actual knee replacement surgery. As Dr. Shall testified:

> A: Specifically speaking, it doesn't really matter whether you're explanting or whether you're dealing with an infected hip, whether dealing with an infected plate, whether dealing with an infected ligament, **the principles of treating postoperative infection in the face of implantation of foreign material is the same.** It doesn't matter whether [it] is total knee, whether it's a hip hemiarthroplasty, half of a hip joint, whether it's a total hip, whether it's a total shoulder, whether it's an anterior cruciate ligament, the principles of dealing with infection with implanted material is the same no matter what the implant is.
>
> Q: And as it was pointed out before, you can do orthopedic replacement surgeries and you have done them, you just choose not to do it because you're doing sports medicine, right?
>
> A: That's correct.
>
> Q: In fact, any orthopedic surgeon who has done a four-year residency can do that, they don't have to specialize in another specialty or fellowship and do sports medicine or something else, correct?
>
> A: No, they don't. And I still do implantation of hip devices for fracture, even as most recently as last week. So, no, I still implant devices. Just not total knees.

Q: And the same principles for what we're dealing with here for this jury is the same; is that correct?

A: **Absolutely the same no matter what the implant is.**

N.T. Trial, 12/1/15, at 40 (emphasis added). The parties acknowledged that this case was about the infections and complications that arose after Plaintiff's surgery and how her pre-operative care may have impacted those complications. Essentially, the principles are universal. Although Dr. Shall did not practice in the same subspecialty, his education, experience, and teaching, as well as his familiarity with the standard of care to be exercised in prevention and treatment of post-operative infection, established that he possessed "sufficient training, experience and knowledge" regarding the medical procedure at issue, to testify as an expert herein. Trial Court Opinion, *supra* at 14-15, *quoting* 40 P.S. § 1303.512(e).

Moreover, as the trial court pointed out, this Court has held that the testifying expert need not even practice in the same name *specialty* as the defendant doctor. *See Hyrcza v. West Penn Allegheny Health System*, 978 A.2d 961 (Pa. Super. 2009) (psychiatrist and neurologist competent to testify to standard of care for prescribing post-operative medication to multiple sclerosis patient); *Smith v. Paoli Memorial Hospital*, 885 A.2d 1012 (Pa. Super. 2005) (general surgeon, oncologist and internist competent to testify about gastrointestinal bleeding and cancer based on their respective gastrointestinal experience in residencies, post-doctoral trainings and professional publications). *See also Vicari v. Spiegel*, 989 A.2d 1277 (Pa.

2010) (plaintiff's expert oncologist competent to testify against defendant otolaryngologist who surgically removed decedent's tongue tumor, and radiation oncologist co-defendant even though not certified in same field, where oncology was related field to otolaryngology and radiation oncology for purposes of subsection 512(e) and internist/oncologist had requisite training, experience and knowledge to testify as to specific standard of care at issue); *Frey v. Potorski*, 145 A.3d 1171 (Pa. Super. 2016) (hematologist qualified to testify as to interventional cardiologist's standard of care in administering anticoagulation drug prior to start of Percutaneous Coronary Intervention (PCI) procedure); *Renna v. Schadt*, 64 A.3d 658 (Pa. Super. 2013) (permitting board-certified pathologist and oncologist to testify in case against surgeon regarding standard of care for performance of fine needle aspiration in lieu of other available biopsy methods). *Cf. Wexler v. Hecht*, 928 A.2d 973, 981–982 (Pa. 2007) (plaintiff's expert, a podiatrist, was not licensed as physician to practice medicine by State Board of Medicine and was, therefore, unqualified under MCARE Act to provide opinion testimony concerning applicable standard of care of physician-defendant). We agree with the trial court that Plaintiff met her burden of establishing that Dr. Shall was qualified to render an opinion as to Defendants' alleged breach of the standard of care and causation in this case pursuant to 40 P.S. § 1303.512(a), (c) and (e). The trial court, therefore, properly denied Defendants relief. *See Rettger*, *supra*; *Bugosh*, *supra*; *see also Brandon v. Peoples Natural Gas Co.*, 207 A.2d 843 (Pa. 1965) (reversing trial court's grant of JNOV where trial court

- 14 -

determined evidence had been erroneously admitted; relief was new trial, not JNOV, because court cannot enter judgment on diminished record).[7]

Defendants next argue they are entitled to JNOV on Plaintiff's claim for future care costs, claiming Plaintiff "failed to establish the reasonableness and medical necessity of these expenses" and thus the court erred and abused its discretion in submitting this claim to the jury. In particular, Defendants argue Plaintiff's expert, Valerie Parisi, R.N. (Nurse Parisi), was not qualified, under either MCARE or common law, to testify as to the medical necessity of Plaintiff's future care needs. In the alternative, Defendants seek reduction of the award to present value. ***See*** Appellants' Brief, at 4.

When seeking future medical expenses, a plaintiff must establish, through expert testimony, that future medical expenses will be incurred and the reasonable estimated cost of such services. ***Mendralla v. Weaver Corp.***, 704 A.2d 480, 485 (Pa. Super. 1997). Nurse Parisi is a registered nurse, a case manager and a life care planner. She graduated from Thomas Jefferson University School of Nursing in Philadelphia in 1980, and is certified in both life care planning and elder care management. N.T. Trial, 12/3/15, at 8-9. She is also certified in rehabilitative nursing, since 1998, and is a member of the Association of Rehabilitation Nurses, the American Association

---

[7] The court below correctly rejected Defendants' motion for JNOV. On the trial record, the issue was one for the jury to resolve. Had Dr. Shall's testimony been improperly admitted, the remedy would have been a new trial as JNOV cannot be entered on a diminished record. ***See Brandon***, ***supra***. ***See also Kotlikoff v. Master***, 27 A.2d 35 (Pa. 1942).

of Nurse Life Care Planners, the International Association of Rehabilitation Professionals, and the American Associating of Legal Nurse Consultants. *Id.* at 10-11. Nurse Parisi served as a mentor and instructor at both Widener University and the University of Delaware for legal nursing consulting students. *Id.* at 12-13.

Nurse Parisi explained that life care planning is the "projection of future care needs for somebody with a catastrophic injury or illness across life expectancy and what that care will cost into the future." *Id.* Additionally, she stated that elder care management is the

> coordination of care for an elderly individual[, who] might need placement, say, in assisted living or a nursing home or they might need help at home, home care. They might need referrals to various physicians or various therapists. They might need their house modified so they can age in place in the home that they're in. So an elder care manager talks with the family and the patient and comes up with a plan in terms of putting those resources together.

*Id.* at 9. Over Defendants' objection, the court accepted Nurse Parisi as an expert in the area of rehabilitation and life care planning, and ruled that she was qualified to testify as an expert as to the reasonableness and medical necessity of Plaintiff's future care costs. *Id.* at 30.

Defendants argue that future care costs required the expert testimony of a physician, or that Nurse Parisi's life care plan, dated June 12, 2015, required approval by a physician. With respect to Nurse Parisi's qualification as an expert, the trial court has provided a comprehensive discussion and disposition of this issue in its opinion, and we rely on it to dispose of this issue.

*See* Trial Court Opinion, 6/29/17, at 19-25 (finding: Nurse Parisi's testimony was not "medical opinion" under MCARE and therefore her testimony was not bound by Act's expert qualification requirements, and Nurse Parisi "clearly possessed reasonable pretension to specialized knowledge on the subject" and therefore was qualified under common law to testify as expert on Plaintiff's future care costs).[8]

Defendants' alternative argument, that the court's award of future care costs should have been reduced to present value, is also meritless. Prior to the enactment of the MCARE Act, the law reflected a long-settled policy to this

_____

[8] We add that Defendants' reliance in their appellate brief on **Vicari**, **supra**, and **Weiner v. Fisher**, 871 A.2d 1283, 1290 (Pa. Super. 2005), is misplaced. Neither of case concerns expert testimony on the issue of future care costs, rather, both **Vicari** and **Weiner** address the qualification of a *physician* to testify as to the *standard of care*. In **Vicari**, our Supreme Court held that, under subsection 512(e) of MCARE, plaintiff's expert, a medical oncologist "had sufficient training, experience, and knowledge to testify as to standard of care for the narrow, specific issue of care presented, due to his active involvement in a field of medicine related to that of the defendant physicians[,] an otolaryngologist and a radiation specialist." **Vicari**, 989 A.2d at 1285. In **Weiner**, we vacated the trial court's order granting defendant-doctor's non-suit. There, the trial court refused to qualify plaintiff-appellant's expert witness, Dr. William Bisordi, who was to testify as to the relevant standard of care and defendant-doctor's alleged breach. The court held that Dr. Bisordi was not qualified to testify, as he was not currently engaged in active clinical practice or teaching in the relevant area and he had retired from these activities over five years before trial. We addressed the interpretation of sections 512(b) and 512(c) of MCARE, which establishes criteria for the qualification of an expert witness in a medical professional liability action against a physician. **Weiner**, 871 A.2d at 1286. Dr. Bisordi's testimony "was to address the standard of care that would have applied when a gastroenterologist was presented with a patient . . . who exhibited certain symptoms and had a family history of gastrointestinal cancer." **Id.** at 1289.

effect. In **Yost v. West Penn Railways Co**., 9 A.2d 368 (Pa. 1939), the

Pennsylvania Supreme Court unambiguously stated that,

> Present worth does not apply to damages awarded for future pain, suffering and inconvenience. Nor does it apply to future medical attention. Future medical attention presupposes an out-of-pocket expenditure by the plaintiff. [The plaintiff] was entitled to have defendant presently place in her hands the money necessary to meet her future medical expenses, as estimated by the jury based upon the testimony heard, so that she will have it ready to lay out when the service is rendered. Damages for expected medical expenses and for future pain and suffering are entirely different from damages for loss of future earnings, which, of course, must be reduced to present worth.

**Id.** at 369-70 (citation omitted); **see also Renner v. Sentle**, 30 A.2d 220

(Pa. Super. 1943) (same). Defendants argue, however, that the trial court

ignored the plain language of section 509(b) and, instead, relied on case law

decided prior to the enactment of the MCARE Act.

> Section 509(b)(1) of the MCARE Act provides:
>
> Except as set forth in paragraph (8), future damages for medical and other related expenses shall be paid as periodic payments **after payment of the proportionate share of counsel fees and costs based upon the present value of the future damages awarded** pursuant to this subsection[.]

40 P.S. § 1303.509(b)(1)(emphasis added). Recently, in **Tillery v.**

**Children's Hospital of Philadelphia**, 156 A.3d 1233 (Pa. Super. 2017), this

Court affirmed the trial court's interpretation of section 509 of the MCARE Act

"to require that future medical expenses are only to be reduced to present

value **for the purpose of calculating attorney fees and costs.**" **Id.** at

1249, citing **Bulebosh v. Flannery**, 91 A.3d 1241, 1243 (Pa. Super. 2014)

(emphasis added). Defendants contend, however, that **Tillery** ignored the plain language of section 509(b)(1), as it "relied on non-MCARE cases decided between 1939 and 1943." Appellants' Brief, at 46 n.22 (citing **Yost**, **supra**, and **Renner**, **supra**). Defendants noted that a petition for allowance of appeal in that case is "currently pending before the Supreme Court[.]" Appellants' Brief, at 46, n. 22. We point out, however, that on October 10, 2017, several weeks after Defendants filed their brief, the Pennsylvania Supreme Court denied allowance of appeal in **Tillery**. **See Tillery v. Children's Hospital of Philadelphia**, 172 A.3d 592 (Pa. 2017). Thus, **Tillery** remains the law. We conclude, therefore, that section 509 of the MCARE Act requires that future medical expenses be reduced to present value only for purposes of calculating attorney fees and costs. **See** 40 P.S. § 509(b)(1); **see also Sayler v. Skutches**, 40 A.3d 135, 140 (Pa. Super. 2012) (concluding that pursuant to plain language of section 509(b)(1), future medical damages award that had accrued at time of decedent's death should be reduced to present value only to determine amount of attorney's fees).

Next, Defendants argue that Hospital is entitled to JNOV because Plaintiff failed to present expert testimony establishing that the conduct of the nurses breached the standard of care or caused or increased the risk of harm to Plaintiff. At trial, Plaintiff presented the expert testimony of Richard Bonfiglio, M.D., a Pennsylvania-licensed physician with board certification in Physical Medicine and Rehabilitation, the discipline overseen by Dr. Nissley, who was the "captain" of the team of employees that included nurses,

therapists, social workers and resident physicians. *See* N.T. Trial, 12/2/15, at 60-134. Doctor Bonfiglio was accepted as an expert in the area of physical medicine and rehabilitation. *Id.* at 81. As the trial court points out, Defendants did not object to Dr. Bonfiglio's qualifications or to the foundation or factual basis of his testimony. *See* Trial Court Opinion, *supra* at 18. This finding is supported in the record. In any event, Dr. Bonfiglio was clearly qualified to testify as to the standard of care and the deviation from that standard, including with respect to nursing functions, while Plaintiff was in the rehabilitation unit from December 4, 2010 until December 22, 2010. *See* N.T. Trial, 12/2/15, at 60-81. To the extent Defendants' argument refers to the sufficiency of that evidence, we agree with the trial court that JNOV was not warranted.

Doctor Bonfiglio reviewed Plaintiff's medical records, as well as various depositions, and he testified in particular with respect to the Stage II open skin sores on her heels, sacrum and right knee:

A:    [Plaintiff] developed a number of wounds while she was on the rehabilitation unit between [] December 4th and December 22nd, including over the sacrum, over the left buttocks, over both of her heels. And she had a blister near her right knee wound. She had a number of different areas of skin breakdown that occurred while she was on the rehabilitation unit. . . . So as I mentioned earlier it is a team effort in providing care for these individuals. But the rehab physician [Dr. Nissley] is the captain of the team basically or the coach so is ultimately responsible for the care given. It's the nurses that provide the day-to-day care, the hands-on care throughout the 24 hour cycle. So they're certainly important to his process. But the attending physician is also important to the process for directing the appropriate care for individuals like [Plaintiff] who had undergone major surgery an

needed medical management, number one, to prevent the pressure ulcers from occurring, an number two, dealing with them aggressively so that they heal as quickly as possible without spreading infection. And that they be dealt with during the time on the rehabilitation unit as well as after discharge.

N.T. Trial, 12/2/15, at 91-93. Doctor Bonfiglio explained that Stage II means that "there's actually an open area, that the skin has been damaged, that there is a pressure sore there." *Id.* at 89. He also testified that the notes indicated her left heel had "black necrotic skin." *Id.* at 93. Essentially, the tissue was dead, and "dead tissue by its nature is infected." *Id***.** Doctor Bonfiglio continued:

A: It is my opinion that the sores that she developed while she was on the rehabilitation unit were directly a contributing factor to her ongoing decline in health. And her having ongoing problems with infection leafing to her eventual amputation of her left lower limb.

Q: Doctor, the opinions that you offer, are they offered to a reasonable degree of medical certainty?

A:     Yes, ma'am.

Q:     With regard to the deviations from the standard of care like you mentioned with a team, Dr. Nissley is in charge of a team, who is it that you felt deviated from the standard of care in this situation?

A: Well, as the captain of the team Dr. Nissley deviated from the standard of care, as did all the nurses that were providing care as well to the patient. But, again, I hold the attending physician to be particularly responsible. Certainly there were resident physicians, there were other doctors, the orthopedic surgeons were still following her. But the primary responsibility he had [ ] because she was on the rehab service. And that particularly goes to Dr. Nissley. But certainly the nurses also are responsible. . . . So they should certainly have been aware that she had potential for bad things happening. She had a history of diabetes, she had a history of high blood pressure, she had a history of congestive

heart failure. While she was on the rehab unit, because she was confused, they got a CT scan of her brain and it showed that she had a stroke in the past. Her EKG had shown she had a heart attack in the past. So heart attacks happen when the blood flow to the heart is not adequate. Strokes happen when the blood flow to the brain is not adequate because there's a problem with the arteries. Should have been easier to understand that there might have been a problem with blood flow to her legs.

*Id.* at 99-100. Doctor Bonfiglio pointed out that "virtually everybody admitted to [the] rehabilitation unit is at risk for development of pressure ulcers, so nursing staff and physicians on rehabilitation units should certainly be aware that any of the patients they admit, for the most part, are at risk for pressure ulcers." *Id.* at 115.

Viewing the evidence in the light most favorable to the verdict winner and granting that party all favorable inferences therefrom, we agree with the trial court's determination that there was sufficient evidence presented at trial that the nursing care involved in Plaintiff's care in the acute rehabilitation unit fell below the standard of care or caused or increased the risk of harm to Plaintiff. *See* N.T. Trial, 12/2/15, at 97-115. *See also Koller*, 115 A.3d at 321.

With respect to Defendants' final three claims, that the jury's verdict is contrary to the overwhelming weight of the evidence, that the court abused its discretion in refusing to mold the verdict with respect to past care costs and erred in awarding delay damages on the award for future care costs, we conclude that the trial court opinion comprehensively discusses and properly resolves these issues. We, therefore, adopt the trial court's reasoning and

dispose of those claims accordingly. **See** Trial Court Opinion, **supra** at 29-36.

We affirm the judgment entered on July 20, 2016 based, in part, on Judge Robinson's opinion filed June 29, 2017. We direct the parties to attach a copy of the opinion in the event of further proceedings.

Judgment affirmed.


Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/25/18

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CIVIL SECTION

ANNABELLE GLASGOW :
:
:
:
v. : **November Term 2012**
: **No. 1343**
:
IAN DUCAN, M.D., *et al.* : **2384 EDA 2016**
:

OPINION

ROBINSON, J. JUNE 29, 2017

OVERVIEW AND PROCEDURAL HISTORY

This appeal arises from a medical malpractice action. Plaintiff/Appellee Annabelle

Glasgow sued Appellants Easwaran Balasubramanian, M.D. ("Dr. Bala"),[1] Frederick P. Nissley,

D.O. ("Dr. Nissley"), and Temple University Hospital ("Temple") for professional negligence

relating to her double knee replacement surgery and post-operative treatment, which led to health

complications including the eventual amputation of her left leg. The jury found in favor of Ms.

Glasgow. Dr. Bala, who was Ms. Glasgow's surgeon and who was primarily responsible for her

orthopedic care, was found forty percent liable; Dr. Nissley, who directed Ms. Glasgow's

inpatient post-operative care, thirty percent; and Temple, thirty percent. The jury awarded

damages totaling $4,268,758, which the trial court later molded to $4,573,945.66. The instant

appeal followed.

---

[1] We refer to Dr. Balasubramanian by this abbreviated name in order to stay consistent with the Notes of Testimony
and evidence, as this is the name he prefers, and it was used throughout trial and in court filings. (See N.T. 11/30/15
at 28.)

1

Glasgow Vs Pomidor Etal-OPFLD

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)  D. KELLY  06/28/2017

12110134300198

Appellants filed several motions seeking post-trial relief. Appellee filed a Motion for Delay Damages in the amount of $367,815.96 to be added to the award for a total award of $4,636,573.90. Appellants disputed the amount of potential delay damages. On July 10, 2016, the trial court denied the motions for post-trial relief. On July 15, 2016, the trial court granted Appellee's Motion for Delay Damages but awarded a smaller amount than Appellee had requested, molding the total verdict award to $4,573,945.66.[2] Appellants filed an Emergency Motion to Stay Execution on the Judgment and Reduce the Amount of Appellate Security. The trial court granted the Emergency Motion and granted leave of twenty-one days for Appellants to post security in the reduced amount of $4,202,928.23.

Appellants' timely 1925(b) Statement sets forth the following allegations of error:

1. The trial court erred and abused its discretion in admitting the testimony of plaintiff's expert witness, Dr. Shall, on the issues of both standard of care and causation in violation of 40 P.S. § 1303.512(a), (c), and (e).
2. Plaintiff failed to establish a record demonstrating that Dr. Shall met the requirements of Sections 512(a), (c), and (e). Dr. Shall's testimony was speculative and unqualified and the trial court erred and abused its discretion in failing to preclude his testimony in its entirety. The only expert testimony critical of Dr. Bala was that of Dr. Shall. Without Dr. Shall's testimony, plaintiff could not make out a *prima facie* case against Dr. Bala. The trial court erred and abused its discretion in failing to grant judgment n.o.v. in Dr. Bala's favor and awarding Dr. Nissley and Temple a new trial due to the unfair prejudice caused by the admission of Dr. Shall's testimony. In the alternative, all defendants are entitled to a new trial due to the unfair prejudice caused by the admission of Dr. Shall's testimony.
3. The trial court erred and abused its discretion in denying Temple's Motions for a nonsuit, directed verdict and judgment n.o.v., since there was no expert testimony demonstrating that the conduct of the nursing staff on Temple's acute rehabilitation unit breached the standard of care or caused, or increased the risk of, harm to plaintiff. Dr. Bonfiglio was not qualified to render causation opinions. Therefore, Temple is entitled to the entry of a judgment n.o.v. in its favor or, in the alternative, a complete new trial.
4. Plaintiff's only expert witness critical of the nursing care, Dr. Bonfiglio, was required, but failed, to set forth the facts upon which his opinion, that the nurses deviated from the standard of care in allowing pressure sores to develop and progress, and in failing to adequately treat the sores, was based. There is no

---

[2] The court set forth in its Order an explanation and method for its calculation of delay damages.

2

testimony, from the factual record, as to what conduct of the nurses or lack of conduct deviated from the standard of care. The trial court therefore erred and abused its discretion in failing to grant a nonsuit, directed verdict and judgment n.o.v. in favor of Temple as well as a new trial in favor of the remaining defendants due to the prejudice caused by plaintiff presenting a claim to the jury against Temple based on the conduct of the nurses.

5. The trial court erred and abused its discretion in denying defendants' Motions for nonsuit, directed verdict and judgment n.o.v. on plaintiff's claim for future care and related expenses, since plaintiff failed to present an expert witness qualified to testify as to the reasonableness and medical necessity of the claimed future care costs, thereby entitling defendants to a judgment n.o.v. on this claim and a molding of the verdict to reduce it by the amount of the award for plaintiff's future care and related expenses. The trial court also erred and abused its discretion in denying defendants' alternate request for a molding of the award for future care and related expenses to present value pursuant to 40 P.S. § 1303.509(b)(1), or for a complete new trial or a new trial on damages or remittitur.

6. The trial court erred and abused its discretion in allowing plaintiff to present a claim for past lost wages based on her testimony alone after she repeatedly ignored defendants' discovery requests for income tax returns and pay stubs verifying employment and salary, which unfairly and irreparably prejudiced defendants' ability to meaningfully cross-examine plaintiff and challenge her speculative testimony and unsupported claim. The trial court erred in denying defendants' Motions for nonsuit, directed verdict and partial judgment n.o.v. and molding of the past wage loss verdict. The trial court also erred in denying defendants' alternate request for a remittitur, reducing the verdict by the entire $127,000.00 past wage loss award or, at minimum, to $90,000.00, which is the highest amount that plaintiff's testimony and evidence would support. The trial court further erred and abused its discretion in denying defendants' alternate request for a complete new trial or a new trial on damages.

7. The trial court erred and abused its discretion in refusing to grant a complete new trial or a new trial on damages, since the jury's verdict was based on sympathy and prejudice and was contrary to the overwhelming weight of evidence.

8. The trial court erred and abused its discretion in refusing to mold/remit the jury's award of past care costs, in the amount of $81,895.00, to $62,227.21, in order to conform to the stipulated amount of past care costs or, in the alternative, in refusing to grant a complete new trial, new trial on damages or a remittitur of this excessive and unsupported award. The jury heard no testimony as to past care costs. Instead, defense counsel stipulated that $62,227.21 in past care costs were accurate, reasonable and necessary for the services that were provided. 12/7/15 N.T. 6-8. Accordingly, the jury was instructed that plaintiff's past care costs "are in the amount of $62,227.21." 12/7/15 N.T. 97.There was no basis to award an amount in excess of $62,227.21, and the trial court erred and abused its discretion in refusing to reduce, remit or mold this award accordingly.

9. The trial court erred and abused its discretion in awarding Pa. R.C.P. 238 delay damages on the jury's award of $2,195,703.00 for future care and related

3

expenses. Applying Pa. R.C.P. 238, which is a form of pre-judgment interest, to awards of future medical expenses in medical professional liability actions is contrary to the goals of the MCARE Act and to the express language of Section 509 of the MCARE Act, 40 P.S. § 1303.509.

10. Although defendants believe the trial court erred in awarding delay damages whatsoever, the trial court erred in denying defendants' request that the delay damages be based upon the present value of the award for future care and related expenses, or the cost of the court-approved financial instrument funding the future medical expenses as they accrue and become payable. Moreover, the trial court erred in denying defendants' request that, in accordance with 40 P.S. § 1303.509(b)(6), this portion of the delay damages award be placed into the court-approved financial instrument covering plaintiff's future care and related expenses to be paid on, and in accordance with, the same terms as future medical expenses.

11. With respect to the issues raised in this Rule 1925(b) Statement, defendants adopt and incorporate by reference herein those matters pled and argued within their Post-Trial Motions and Brief in Support of Post-Trial Motions.

## FACTS

In 2009, Annabelle Glasgow was being treated for chronic knee pain by a Temple orthopedic surgeon, Dr. Bruce Vanette. Ms. Glasgow had a history of vascular issues such as congestive heart failure, stroke, diabetes, and hypertension, all of which posed risks of decreased post-operative wound healing and increased risk of infection. (N.T. 12/3/15 at 92, 12/1/15 [morning session] at 55-56.) At one appointment, Dr. Vanette found and recorded in his notes that Ms. Glasgow had a decreased pedal pulse in one foot, potentially a sign of circulation issues. (N.T. 12/1/15 at 67-68.) Dr. Vanette referred her to his colleague, Dr. Bala, when Dr. Vanette left the practice. (N.T. 12/4/15 at 38.) Dr. Bala was aware of Dr. Vanette's finding and of Ms. Glasgow's preexisting health conditions. (Id. at 8, 51-52, 65.)

Dr. Bala, an orthopedic surgeon with a subspecialty in total joint replacement,[3] diagnosed Ms. Glasgow with degenerative arthritis in both knees. (N.T. 12/1/15 [afternoon session] at 49; N.T. 12/4/15 at 65.) Initially, he treated her with pain medications and injections, but those

---

[3] See Discussion *infra* Part 2(a)(ii) on the proper classification of the specialties and subspecialties of Dr. Bala and to witness Dr. Lawrence Shall.

4

eventually became insufficient. As the next step, in late 2010, Dr. Bala recommended bilateral knee replacement surgery. He testified at trial that he always checked his patients' circulation before surgery, but he admitted that Ms. Glasgow's appointment notes do not show that he ever evaluated her. (N.T. 12/4/15 at 66.) Dr. Bala performed the surgery on December 1, 2010.

It is undisputed that Ms. Glasgow was admitted to Temple's acute rehabilitation unit afterward for post-operative treatment, that Appellant Dr. Nissley headed her inpatient post-operative care team in Temple's acute rehabilitation unit, and that she suffered extensive health problems over the next two years relating to her prosthetic knees, infections in her surgical incisions, and pressure wounds (notably on her heels and buttocks). It is further undisputed that Dr. Bala was significantly involved in her post-operative care. Dr. Nissley was the attending doctor ultimately responsible for Ms. Glasgow's care while she was in the acute rehabilitation unit. (N.T. 12/3/15 at 99-100, 124.)

Six weeks after Ms. Glasgow's surgery, the surgical incisions on her right knee reopened, showing infection. This, and subsequent developments, led to five further operations performed by Dr. Bala within a one-year period to revise the implantation and combat infection, with the objective of salvaging the knee prosthetics. One of Ms. Glasgow's expert witnesses testified at trial that several of the procedures were "of no benefit [to her] whatsoever" because the knees were too far gone to save. (N.T. 12/1/15 at 25-26.) Dr. Bala also did not perform wound cultures or synovial fluid biopsies during those procedures, easy-to-perform tests which would have indicated whether the infection(s) had become so entrenched that keeping the implants was no longer viable. (Id. at 73-76.)

On May 31, 2011, approximately six months after the original surgery, a Dr. Baumholtz in the rehab unit notified Dr. Bala that he had drained "copious amounts of pus" from Ms.

Glasgow's left knee. (N.T. 12/4/15 at 79.) Dr. Bala did not dispute at trial that this was a certain sign of infection. [4] (Id. at 79-80.) He could not recall if he consulted an infectious disease doctor for Ms. Glasgow at that time, though he had done such consults for some of her prior infections. (Id.) Less than two months later, in July 2011, Dr. Baumholtz transferred Ms. Glasgow out of the rehab unit and readmitted her to the hospital's general inpatient services because she had a strong odor emanating from her leg wound that signified a specific bacterial infection. (N.T. 12/1/15 at p. 14-15.) When doctors opened her cast, they found that the infected wound tissues had again reopened and separated, leaving the knee prosthesis externally visible. (Id. at 14-16.) Dr. Bala told Ms. Glasgow that her treatment options were either a knee fusion, which would render the joint permanently unable to bend, or an above-the-knee leg amputation. (N.T. 12/4/15 at 60.)

Ms. Glasgow sought a second opinion. On October 20, 2011, she consulted Dr. Scott Levin at Penn Presbyterian Hospital. (N.T. 12/1/15 at 19.) Dr. Levin performed a Doppler examination, a test which measures the pulse. (Id.) The Doppler examination showed that the patient "had one of the pulses in the foot, but the pulse in the ankle was basically not there." (Id.) This led Dr. Levin to run an MRA test, which is an MRI that focuses only on blood vessels. (Id. at 21-22.) The MRA revealed that Ms. Glasgow's leg circulation was much more obstructed than Dr. Bala or the rehab unit doctors had thought, so much so that knee fusion was no longer viable. (Id. at 23.) Amputation of the left leg was her only option. One of the Penn Presbyterian doctors performed the amputation in 2012, and Ms. Glasgow underwent performed further procedures in 2013 to reimplant the right knee prosthesis.

The amputation understandably had a significant and permanent effect on Ms. Glasgow's everyday life. She testified at trial that she was no longer able to live an independent lifestyle or to

---

[4] However, we note that Dr. Bala did hotly dispute the causative role of infection in Ms. Glasgow's harms and the point at which her wound infections became anything more than superficial. (See, e.g., N.T. 12/4/15 at 69-81.)

6

continue working as a banquet server, as she was permanently wheelchair-bound. She could no longer drive a car and was confined to the ground level of her three-story home. Even with home renovations to increase handicap accessibility, she was not able to care for herself without assistance. She required full-time care and was unable to be left alone at her house for significant periods of time. Her family members and friends personally provided home care as they were able, but predicted that they would eventually be unable to perform necessary tasks due to their own aging and physical limitations. (N.T. 11/30/15 at 82-95, 174-78.)

## DISCUSSION

### 1. Standards of review

For nearly all of their allegations of error discussed herein, Appellants assert that they were entitled to post-relief such as nonsuit, judgment n.o.v., remittitur, a new trial generally, or a new trial on damages only. The legal standards for each are as follows:

### a. Nonsuit

A compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence. A nonsuit is properly entered before submission of the case to the jury if the court, viewing all evidence in favor of the plaintiff and drawing all reasonable inferences therefrom in her favor, finds that the plaintiff has still failed to submit sufficient evidence to establish the necessary elements to maintain the cause of action. Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P., 40 A.3d 1261, 1274 (Pa. Super. Ct. 2012) (citation omitted). A compulsory nonsuit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable on the pleaded cause of action. Id.

### b. Judgment n.o.v.

A trial court's grant or denial of a judgment n.o.v. is subject to review as an abuse of discretion or an error of law. Czimmer v. Janssen Pharm., 122 A.3d 1043, 1050 (Pa. Super. Ct. 2015). A court abuses its discretion if, in reaching a conclusion, the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias or ill will, as supported by the evidence or the record. Braun v. Target Corp., 983 A.2d 752, 759-60 (Pa. Super. Ct. 2009) (citation omitted).

There are two bases upon which a judgment n.o.v. can be entered: (1) the movant is entitled to judgment as a matter of law, or (2) the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. Id. (quoting Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 890-91 (Pa. Super. Ct. 2011). With the first, a court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. With the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was "beyond peradventure." (Id.) Judgment n.o.v. is only proper in a clear case and with all doubts resolved in favor of the verdict winner. (Id.) Judgment n.o.v. should not be used to supplant the jury's choices to believe or disbelieve the credibility of witnesses, as the jury is entitled to believe all, part, or none of the evidence presented. Brinich v. Jencka, 757 A.2d 388, 395 (Pa. Super. Ct. 2000).

### c. Remittitur

The decision to grant or deny a motion for remittitur is within the sound discretion of the trial court. Vogelsberger v. Magee-Womens Hosp. of UPMC Health Sys., 903 A.2d 540, 555 (Pa. Super. Ct. 2006) (citation omitted). Remittitur will be affirmed on appeal absent an abuse of discretion or manifest error of law. Smalls v. Pittsburgh-Corning Corp., 843 A.2d 410, 413 (Pa. Super. Ct. 2004). Grant of remittitur is appropriate only when the award was "plainly excessive

8

and exorbitant" (Haines v. Raven Arms, 640 A.2d 367, 369 (Pa. 1994)), and "so grossly excessive as to shock our sense of justice" (Powell v. Philadelphia, 457 A.2d 1307, 1308 (Pa. Super. Ct. 1983)).

### d. New trial

Review of a trial court's denial of a new trial is limited to determining whether the court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. If there is any support in the record for the denial of a new trial, the decision must be affirmed. The appellate court considers whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Braun v. Target Corp., 983 A.2d at 759-60 (citation omitted).

### e. Molding of the verdict

The trial court has the power to mold the jury's verdict to conform with the clear intent of the jury. In cases where verdicts are not technically correct in form, but they manifest the clear intent of the jury, the court may correct the verdict without a new trial. Mendralla v. Weaver Corp., 703 A.2d 480, 485 (Pa. Super. Ct. 1997) (en banc).

### 2. The trial court did not err in admitting the expert testimony of Dr. Shall.

Appellants claim that the trial court erred and abused its discretion in admitting the testimony of Appellee's expert witness Dr. Lawrence Shall. Appellants allege that (a) Dr. Shall's testimony was not presented with sufficient foundation under the MCARE statute, and (b) because it was speculative and unqualified. They further argue that (c) all appellants are entitled to a new trial because of the unfair prejudice caused by Dr. Shall's testimony. For the reasons stated below, these claims fail.

#### a. Dr. Shall's testimony met the requirements for expert witness testimony under the MCARE Act.

9

### i. MCARE Statute

The Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 P.S. § 1303.101 *et seq.*, governs medical professional liability claims against physicians. MCARE Act § 512 establishes the requirements for expert medical testimony at trial as follows:

> (a) General rule.--No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> (b) Medical testimony.--An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:
>
>> (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.
>>
>> (2) Be engaged in or retired within the previous five years from active clinical practice or teaching.
>
> Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.
>
> (c) Standard of care.--In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:
>
>> (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.
>>
>> (2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).
>>
>> (3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

10

(d) Care outside specialty.--A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

> (1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

> (2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

(e) Otherwise adequate training, experience and knowledge.--A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

The MCARE Act applies in this case because it is a medical malpractice action with defendant physicians. Case law emphasizes that all three subsection (c) requirements for expert witnesses – familiarity with standard of care, same subspecialty, and same board certification – are mandatory. Anderson v. McAfoos, 57 A.3d 1141 (Pa. 2012) (citing Vicari v. Spiegel, 989 A.2d 1277, 1281 (Pa. 2010)). Decisions regarding admissibility of evidence, including admission of expert witness testimony within the purview of the MCARE Act, are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion or error of law. Weiner v. Fisher, 871 A.2d 1283, 1285 (Pa. Super. Ct. 2005) (citation omitted).

### ii. "Same subspecialty" requirement

A challenge under MCARE Act Section 512 presents a question of statutory interpretation. Id. The Statutory Construction Act governs all issues relating to interpretation of statutory language. 1 Pa. C.S.A. § 1501 et seq. Proper statutory analysis seeks to ascertain and effectuate the intent of the General Assembly. Commonwealth v. Martorano, 89 A.3d 301 (Pa. Super. Ct. 2014). The plain language of the statute, when it is clear and unequivocal, is the best indicator of legislative intent. Weiner, 871 A.2d at 1285. Words and phrases should be interpreted "according

11

to the rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning...shall be construed according to such peculiar and appropriate meaning or definition." Id. (citing 1 Pa. C.S.A. § 1903(a).)

Appellants claim the testimony of Appellee's expert witness, Dr. Shall, was inadmissible because Dr. Bala and Dr. Shall are in different "subspecialties." It is undisputed that both doctors are surgeons in the area of orthopedic medicine. Appellants argue that Dr. Bala's subspecialty is total joint replacement surgery within the larger specialty of orthopedic surgery, and that Dr. Shall's subspecialty is sports medicine. (See Appellants' Br. at 17-18.) Appellee maintains that both doctors specialize in orthopedics and have the same subspecialty of orthopedic surgery. (See Appellee's Br. at 8-9.)

Dr. Shall testified during expert qualification *voir dire* that he was an "orthopedic surgeon" in his thirtieth year of practice. (N.T. 12/1/5 [morning session] at 8-9.) He stated that "orthopedics" was considered a "specific specialty." (Id. at 9.) He also stated, "I practice sports medicine, which is a subspecialty of orthopedics." (Id. at 9, 12.) Both doctors completed residencies in orthopedic surgery. (Id. at 10-11; N.T. 12/4/15 at 33.) Dr. Bala testified that his career had focused on joint surgery, specifically knee replacements, "from the beginning," although his residency was in orthopedics generally. (N.T. 12/4/15 at 33-34.) His practice eventually came to focus on knee replacement procedures, but not because he had been trained exclusively for knee surgeries. (Id. at 34.)

Although the MCARE Act has a "definitions" provision, it does not define "subspecialty." (See 40 P.S. § 1303.513.) The Merriam-Webster Medical Dictionary defines "subspecialty" as "a subordinate field of specialization," and gives the illustrative example, "Child psychiatry is a

12

subspecialty of general psychiatry."[5] Furthermore, this Court is not aware of any binding case law specifically parsing the distinction between "specialty" and "subspecialty."

We agree with Appellants' argument – that "orthopedics" is the specialty, not the subspecialty – because it aligns most closely with the dictionary definition and the way Dr. Shall described his own work. However, this does not render Dr. Shall's testimony inadmissible: it was permitted under the waiver provision discussed below.

### iii. Dr. Shall meets the waiver requirements for the "same subspecialty" provision.

An expert may be competent to testify as to the standard of care without meeting the MCARE Act's subspecialty requirement if the expert is sufficiently qualified by nature of active involvement in a "related field of medicine." 40 P.S. § 1303.512(e). This waiver provision permitted Dr. Shall's trial testimony.

Whether or not an expert witness has been properly qualified to give expert testimony is a decision within the discretion of the trial court, and that decision will not be disturbed on appeal absent an abuse of discretion. Frey v. Potorski, 145 A.3d 1171, 1176-77 (Pa. Super. Ct. 2016) (citations omitted). The standard for expert witness qualification is "a liberal one." Id.

Appellants argue extensively that there was insufficient foundational testimony showing that Dr. Shall was competent to offer standard-of-care opinions on (1) whether or not an infection required removal of the right knee prosthesis in February 2011, (2) whether an infection required earlier removal of the left knee prosthesis in June 2011, and (3) whether placement of an antibiotic spacer was required when removing the left knee prosthesis in July 2011. (Appellants' Br. at 21.) However, this is incorrect, as Dr. Shall testified extensively about his expertise regarding surgical

---

[5] Subspecialty Definition, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/medical/subspecialty (last visited Feb. 28, 2017.)

13

infection issues and joint implantation procedures. As he stated at trial, he was offering testimony about "the complications and infections regarding [joint] implantation" (N.T. 12/1/15 [morning session] at 39), and he has ample experience with joint implantations. This experience is relevant because the principles and standards of care in prevention and treatment of post-operative infections are the same in every case, regardless of what type of joint implantation or replacement is being performed. (Id. at 39-40; 33 [testifying that infection complications are not "specific to the actual surgery."]).

Like Dr. Bala, Dr. Shall completed an orthopedic surgery residency after graduating medical school. (Id. at 11.) His post-residency fellowship in sports medicine "involve[d] surger[ies] mostly of the knee and shoulder." (Id.) He estimated that, in addition to his main focus of implantation procedures, he has performed twenty joint explantation procedures over the course of his career in orthopedic surgery. (Id. at 35.) Furthermore, he is still actively engaged in the performance of joint replacement surgeries and had just performed a hip replacement the week before he gave testimony in this matter. (Id. at 41.) He also teaches resident doctors in the field of orthopedics (id. at 25) and has extensively published scientific papers in the field of orthopedic surgery, including at least one paper in the American Journal of Knee Surgery (id. at 21). He also specifically testified that his experience involves treatment and prevention of post-operative infections. (Id. at 9.)

The trial court found that Dr. Shall possessed "sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in…a related field of medicine within the previous five-year time period" in accordance with 40 P.S. § 1303.512(e). Thus, the court found that he was competent to render his expert opinion under the requirements of the MCARE Act.

14

This is in accordance with recent MCARE Act case law regarding "related field of medicine" challenges to expert testimony. See Frey, 145 A.3d at 1178 (holding that a hematologist was permitted to give expert testimony under Section 512(e) regarding the standard of care to be exercised in the administration of anticoagulation medication because he "often consulted" with subspecialists in the topic at issue and because he demonstrated sufficient expertise and experience on that issue); Vicari, 989 A.2d at 1285-86 (listing the various cancer-related curriculum vitae achievements of a medical oncologist as reason to admit his expert testimony under 512(e), despite the seeming dissimilarity between his field of oncology and the defendant physician's field of otolaryngology, on the issue of whether an otolaryngologist should have given a patient the option of chemotherapy and referred her to a medical oncologist); Hyrcza v. West Penn Allegheny Health Sys., 978 A.2d 961, 973-74 (Pa. Super. Ct. 2009) (psychiatrist and neurologist competent to testify about standard of care for prescribing post-operative medications to multiple sclerosis patient); and Smith v. Paoli Mem'l Hosp., 885 A.2d 1012, 1018-19 (Pa. Super. Ct. 2005) (permitting a general surgeon, oncologist, and internist to testify about gastrointestinal bleedings and cancer based on their respective GI experiences in their residencies, post-doctoral trainings, and professional publications). The Hyrcza and Smith courts held that a testifying doctor need not be even within the same named specialty as the defendant doctor; in the instant case, the testifying doctor and defendant doctor practice within the same umbrella specialty of orthopedics and have both performed many joint implantation and explantation procedures.

Dr. Shall's thirty years of education, experience, and teaching, and his familiarity with the standard of care to be exercised in prevention and treatment of post-operative infection showed that he had sufficient knowledge and experience to testify about Dr. Bala's performance in this case.

**b. Appellants are not entitled to a new trial due to unfair prejudice caused by Dr. Shall's testimony or judgment n.o.v.**

**i. New trial due to unfair prejudice**

As stated above, denial of a motion for new trial will be denied unless the movant can show that the court acted capriciously, abused its discretion, or committed an error of law, and that the court's error controlled the outcome of the case. Braun v. Target Corp., 983 A.2d at 759-60 (citation omitted). Thus, it is the movant's burden to show prejudice. In the instant matter, Appellants have not demonstrated prejudice or presented any evidence thereof arising from the admission of Dr. Shall's testimony in their 1925(b) statement and brief. Therefore, we do not consider the argument on the merits. See Young v. Washington Hosp., 761 A.2d 559, 561 n.3 (Pa. Super. Ct. 2000) (citation omitted) (declining to review a claim of prejudice when movant had failed to support their claim with reference to the record and/or citations to legal authority). See also Jacobs v. Chatwani, 922 A.2d 950, 962 (Pa. Super. Ct. 2007) ("The fact that the jury may have believed [Defendant's expert] rather than the opinion proffered by Plaintiff's expert does not equate to prejudice.")

**ii. Judgment n.o.v. in favor of Appellant Dr. Bala**

In the instant matter, Appellants' only support for their argument is an allegation that Dr. Bala would not have been found liable in the absence of Dr. Shall's testimony. As this argument rests on the assumption that Dr. Shall's testimony was inadmissible, and we have found the testimony was properly admitted, this claim fails.

**3. There was sufficient evidence at trial to support the jury's finding that Appellant Temple was liable for negligence due to the actions and/or inactions of the nursing staff in its acute rehabilitation unit.**

Appellants claim they were wrongfully denied post-trial relief because there was no admissible expert evidence demonstrating that the nursing staff on Temple's acute rehabilitation

16

unit breached the standard of care or caused, or increased the risk of, harm to the plaintiff. This claim fails.

In fact, Appellee's expert witness, Dr. Richard Bonfiglio, gave ample testimony to this particular issue. He testified that the care in the rehab unit fell below the standard of care and explicitly gave several reasons for this conclusion: (1) the pressure sores should have been prevented, (2) the sores were inadequately treated while Appellee was in the unit and should not have worsened while she was in their care; (3) the rehab staff failed to arrange follow-up with wound care doctors specifically for treatment of the sores; and (4) the staff failed adequately address the need for post-discharge care of Appellee's pressure sores when they created her discharge plan. (N.T. 12/2/15 at 97-98.)[6] He also specifically noted that nurses' note-taking about Appellee's care was inconsistent, so it is impossible to know if they were adequately performing tasks for wound care and prevention as frequently as required. (Id. at 107-108.) Furthermore, "virtually everybody admitted to a rehabilitation unit is at risk for developing pressure ulcers," so professional acute rehab nurses should have been especially vigilant about the sores and should have known the significance of the risk they posed to Appellee, especially given her preexisting vascular conditions. (Id. at 115.)

There was sufficient evidence at trial for the jury to conclude that the rehab nurses were negligent in their care of Appellee.

4. **Appellants' allegations of error regarding the expert witness testimony of Dr. Bonfiglio fail because they are waived.**

Appellants assert that the record does not show a sufficient factual basis for Dr. Bonfiglio's opinion, and that he was not qualified to render testimony about causation. Appellee argues that

_____

[6] He furthermore testified that the home health workers probably did not know of the existence of the sores if the discharge notes did not mention it, and that Appellee herself was probably unaware of them due to the loss of physical sensation that accompanies poor circulation. (N.T. 12/2/15 at 98-100; 121-22.)

any such objection was not effectively raised at the time of testimony and is thus waived. (See Pl. Br. in Opp. 16.) Appellee is correct.

It is well-established that post-trial relief may not be granted if the grounds for relief could have been raised during pretrial or trial proceedings, but the party failed to raise it at that time. Pa. R.C.P. No. 227.1(b). This rule ensures that the trial court has the opportunity to correct the alleged trial error. See, e.g., Rancosky v. Washington Nat'l Ins. Co., 130 A.3d 79, 102 (Pa. Super. Ct. 2015) (holding that a claim of error regarding litigation strategy and conduct of counsel was waived because it could have been raised at trial but was only raised for the first time in a post-verdict motion); Hong v. Pelagatti, 765 A.2d 1117, 1123 (Pa. Super. Ct. 2000) ("...[O]ne must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.").

Our review of the record shows that Appellants failed to timely object to the foundational or factual basis of Dr. Bonfiglio's testimony at the time the testimony was elicited. Appellants raised objections as to the scope of inquiry during his testimony (see, e.g., N.T. 12/2/15 at 124-25), but did not object on any other basis. Appellants had raised objections on the basis of foundation and qualification for Dr. Shall earlier at trial. (N.T. 12/2/15 at 42-46.) Appellants also raised similar objections to the testimony of Appellee's forensic economic expert later that same day. (N.T. 12/2/15 at 164-65 [requesting the court to strike the testimony of Mr. Bunin at the close of redirect examination due to the factual substance of his testimony not meeting the MCARE Act requirements].) Appellants were clearly aware they had the option to object to testimony at the time it was elicited. Because this issue was available for objection at the time of Dr. Bonfiglio's

18

testimony and could have been cured during trial, and Appellants failed to raise it at that time, the issue is waived.[7]

5. **Nurse and life-care planner Valerie Parisi was qualified to offer expert witness testimony on Appellee's future medical expenses. Appellants were and are not entitled to nonsuit, directed verdict, or judgment n.o.v. on the basis that Nurse Parisi's expert testimony was improperly admitted.**

Appellants argue that Nurse Parisi's expert witness testimony as a life-care planner should have been precluded because she did not meet the MCARE Act's statutory qualifications requirements for expert witnesses or common-law expert requirements. Thus, they argue, Appellee failed to present a necessary expert witness qualified to testify as to the reasonableness and medical necessity of her future care needs, and so the award of future care costs was improper and unsupported by evidence. (Appellants' Br. 38.) This claim fails.

An item of a plaintiff's claimed damages can only be submitted to the jury once the plaintiff has met her burden of establishing damages by proper testimony. Cohen v. Albert Einstein Med. Ctr., 592 A.2d 720, 729 (Pa. 1991). When the claimed damages are future medical expenses, the claimant must present expert witness testimony to prove the medical necessity of the claimed damages and their reasonable cost. Mendralla, 703 A.2d at 485. Where the evidence shows the value of services already rendered to an injured person and that such service will be required in the future, the jury may use past service costs, without other evidence, to estimate the costs of future care and what that may reasonably include. Pratt v. Stein, 444 A.2d 674, 706 (Pa. Super. Ct. 1982).

The question of whether or not a witness is duly qualified to render expert testimony is within the discretion of the trial court, and the standard for qualification of an expert witness in

---

[7] However, even if the allegation of error were not waived, Dr. Bonfiglio specifically stated that he was relying on the evidence of Appellee's medical records and his own education and experience in reaching his conclusion. (N.T. 12/2/15 at 82-83.) Thus, there is sufficient factual basis for his claims.

19

Pennsylvania is "liberal." Frey, 145 A.3d at 1176-77. The court's decision on the matter will only be overturned for an abuse of discretion or error of law. Id.

The trial court accepted Valerie Parisi, R.N., as an expert in the area of rehabilitation nursing and life care planning[8] after thorough expert qualification *voir dire*. (N.T. 12/3/15 at 30.) Nurse Parisi testified that she reviewed Appellee's medical records and visited her at her home to evaluate her. (Id. at 30-31.) She testified about her findings of Appellee's home health needs – the level of care she was receiving at the time, everyday living tasks and the degree of help she needed to accomplish them, and the medical prosthetics and supplies she needed. (Id. at 30-37.) She also gave her nursing diagnoses, which she formed on the basis of her observations at the house and Appellee's medical records. (Id. at 37.) Using her findings about Appellee's home healthcare needs and her nursing diagnoses, she formulated a "life care plan" that Appellee offered as evidence of future medical expenses. Nurse Parisi thoroughly explained her calculation methodologies for her estimates of the various costs Appellee will incur in her lifetime, including estimates for hired home care aides as compared to costs of Appellee moving into a full-time care facility. She consulted sources like local industry averages for service costs and publications by Medicare and Medicaid Services in making estimates with specific dollar amounts. (Id. at 51.)

Nurse Parisi estimated Appellee's life care costs at approximately $2 million if she continued living at home, and approximately $1 million if she lived in a nursing home for the rest of her life. (Id. at 57.) She clarified on cross-examination that her life care plan had never been endorsed or approved by a physician, as it was "not a prescription strategy [of] care...[but] a conservative estimate of what would be appropriate for [Appellee]." (Id. at 62.)

---

[8] Nurse Parisi defined "life care planning" as "the projection of future care needs for somebody with a catastrophic injury or illness across life expectancy and what that care will cost into the future." (N.T. 12/3/15 at 8-9.)

20

When Appellants objected to the admission of Nurse Parisi as an expert witness, the trial court stated that the jury would be "allowed to give whatever weight it wants to give [her testimony] according to her qualifications." (N.T. 12/3/15 at 29.) The court then admitted Nurse Parisi as an expert witness in the fields of rehabilitation nursing and life care planning. (Id. at 30.)

### a. Nurse Parisi's expert testimony was not barred by the MCARE Act's statutory requirements for expert witness qualifications.

Appellants advance a theory that Nurse Parisi's testimony should be considered "an expert medical opinion" and, therefore, that the proponent of her testimony should be bound by the MCARE Act's expert qualification requirements.[9] We are unpersuaded.

The MCARE Act states that "no person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician" unless the person meets the Act's requirements for expert witnesses. 40 P.S. § 1303.512(a). The Act does not specifically define its use of the term "expert medical opinion." See 40 P.S. § 1303.503.[10]

We conclude that Nurse Parisi's testimony is not a "medical opinion" under the MCARE Act. Her testimony was, as she stated, an "estimate" of "what would be appropriate" in terms of aid for Appellee given her health condition, everyday tasks, and living arrangements. (N.T. 12/3/15 at 62.) Nurse Parisi drew on her own nursing experience and nursing diagnoses to create a life care plan but did not render medical diagnoses or state with specificity what medical treatments Ms. Glasgow would need. (Id. at 22-25, 58.) As the Pennsylvania Supreme Court has noted, nurses are permitted to "diagnose human responses to health problems," and there is a clear distinction

---

[9] For more extensive discussion of MCARE Act expert witness qualification requirements, see Discussion *infra* Part 2a.

[10] Appellants contend that Nurse Parisi's testimony is considered expert testimony on a "medical matter" under the MCARE Act and that "medical matter" should be construed to mean anything involving "the furnishing of health care services." (Appellants' Br. at 46.) As discussed later in this section, we do not find that Nurse Parisi's testimony fell under the MCARE Act requirements, and thus, we need not consider the validity of this proposed definition.

21

between such nursing diagnoses and medical diagnoses. <u>Freed v. Geisinger Med. Ctr.</u>, 971 A.2d 1202, 1209 (Pa. 2009) (citation omitted); 63 P.S. § 212(4), (6).

Nurse Parisi's recommendations focused on Ms. Glasgow's needs for getting around the house and taking care of herself. Nurse Parisi drew on her experience, for instance, to predict that Appellee would probably require X-rays in the future simply because she was an amputee and thus her stump had potential for complications. (N.T. 12/3/15 at 49.) She based the cost estimate for such X-rays on Appellee's past and current X-ray costs. (<u>Id.</u> at 65.) She stated that home care needs were determined by a nurse assessment. (<u>Id.</u> at 22.) She conceded that a physician needed to sign the orders but only "for reimbursement purposes;" the doctor did not make the ultimate decision on whether or not the home care plan was implemented. (<u>Id.</u> at 22-23.) There was in fact no mandate that her plan be implemented at all (<u>id.</u> at 61); it was prepared for the purpose of estimating future care costs for the instant litigation (<u>id.</u> at 60-62). She admitted that her care was not a prescription, and she did not discount the possibility that Appellee's needs could change in the future for better or worse, thus changing her future medical expenses. (<u>Id.</u> at 62.) She even specifically noted that a physician would perform "the actual diagnostics" of Appellee's care needs according to the doctor's medical diagnoses. (<u>Id.</u> at 49.)

Appellants cite cases in support of their argument that physicians must corroborate life-care plan testimony, although their references are mostly to nonbinding dicta[11] and trial court orders. The cases cited contain no discussions about the validity of expert testimony about a life

---

[11] <u>See</u> <u>Castellani v. Scranton Times, L.P.</u>, 124 A.3d 1229, 1243 n.11 (Pa. 2015) (citation omitted) (defining "dicta" as "an opinion of the court…that is not essential to the decision. Dicta has no precedential value.").

care plan that was created without physician approval; the courts merely noted, without further evaluation, that such approval had been given.[12][13]

Appellants would have us hold that, because life care plans were corroborated by doctors in these other cases, and the courts did not explicitly disapprove, such corroboration is required in all other cases. We disagree. Furthermore, we find that Nurse Parisi did not give an "expert medical opinion" and, thus, was not bound by the MCARE Act's expert witness qualification requirements.

### b. Nurse Parisi was qualified to testify as an expert witness under common-law requirements.

Appellants furthermore argue that Nurse Parisi was unqualified to offer an opinion on the amounts of past and future medical expenses and costs under common law. This claim is meritless.

Under common law, a person is deemed an expert if she "possesses knowledge not within the ordinary reach" and is thus "specially qualified" to speak upon a particular subject. Pratt, 444 A.2d at 706. Such an expert "need not have all the knowledge in her special field of activity in order to qualify…[r]ather, [she] need only have a reasonable pretension to specialized knowledge on the subject under investigation." Id.

In Appellants' view, Nurse Parisi admitted on the stand that her own findings were not qualified for expert testimony on future medical expenses without the approval of a physician. This argument relies on the following exchange from *voir dire* testimony:

> Q *[Appellants' counsel]*: And you would agree with me that the life care plan should be specific to [the patient's] needs, correct?
> A *[Nurse Parisi]*: Yes.

---

[12] The one reported case Appellants cite, Green v. Pa. Hosp., 123 A.3d 310 (Pa. 2015), is inapposite: it held that a nurse expert witness could be considered unqualified, in the court's discretion, to render *causation* testimony despite meeting MCARE Act expert witness requirements. The case does not include any mention of physician approval of a life care plan. Furthermore, Nurse Parisi did not give causation testimony; she testified about Appellee's current care needs, not about how she came to have those needs.

[13] Appellants cite a number of unreported cases to support their contention that physician approval of life care plans is required. However, there is no specific indication in any of the cited cases that physician approval was especially significant or essential to the courts' verdicts, or that they were issues on appeal.

23

Q: You would agree with me that a physician must specifically say what is required for that individual, correct?

A: No, I would not agree with that.

Q: Okay. Do you recall giving testimony a few years ago, it was a New Jersey case, Baguette v. Riviera? Do you recall that? [....] [In that case, you testified] that "life care plans, specifically individual, are not generalized to a particularly disability, correct?" "Correct." Answer is, that is correct. Next question [in the Baguette case transcript] is, "So you need a physician to specifically say what is required for an individual, correct?" The answer was, "Correct." That was your testimony, correct?

A: Yes, again, I don't know the context and what that question was. I don't know what that was referring to in that particular deposition. If it was referring to a specific treatment plan, that would be the answer. But not all – as I mentioned, not all health care is medical care.

Q: But you still agree that that's your testimony, correct?

A: That was my testimony, but I don't see the complete testimony so I'm not really certain what that was referring to.

[....]

Q: And this [life care plan Nurse Parisi created for Annabelle Glasgow] has never been endorsed or approved by any physician, correct?

A: I don't believe so, no.

(N.T. 12/3/15 at 26-28, 61.) Appellants contend that this prior testimony of Nurse Parisi in the Baguette case disqualified her to present expert testimony without the corroboration of a physician. This argument fails.

As stated above, Nurse Parisi was not offering as evidence a life-care plan which Appellee was required to implement; she was testifying as to her projections of what "appropriate care" for Appellee would cost. The Baguette case testimony referred to whether or not "a physician must specifically say what is required for an individual" on the basis of the individual's "particular disability." (Id. at 26.) Again, Nurse Parisi did not make any medical diagnosis of Appellee or her particular conditions. She merely noted how Appellee's conditions were affecting her ability to perform life care tasks, proposed workarounds and solutions, and estimated what the costs of such solutions were likely to be.

24

The common-law standard for expert witness qualification is whether or not the proposed expert has "reasonable pretension to specialized knowledge on the subject" (see Pratt), and Nurse Parisi clearly does. She has a diploma in nursing from Jefferson University, worked for fourteen years as a visiting nurse responsible for "assessing [patients'] needs out of the hospital, coordinat[ing] their therapy needs," and supervising home health aides, and then she worked for ten years with rehabilitation clinics as a case manager for injured individuals. These job positions gave her nursing experience with many amputees and their life care needs. (N.T. 12/3/15 at 8, 13-14.) She testified that she received specialized training in life care planning and remains current in the life care planning field to keep her certifications and licensure. (Id. at 12.) She is furthermore certified in elder care management and rehabilitation nursing (id. at 9-10), both of which are relevant given Appellee's age and rehabilitative needs.

Nurse Parisi was competent to testify as an expert witness under common law in the fields of rehabilitative nursing and life care planning.

6. **The trial court did not err regarding the forensic economics testimony of Royal Bunin and its impact on the future care costs award.**

    a. **The admission of Royal Bunin's forensic economic testimony regarding Ms. Glasgow's future care expenses was proper.**

Appellants' argument on this issue is based entirely on the notion that Mr. Bunin's testimony was founded on Nurse Parisi's improperly admitted testimony regarding Ms. Glasgow's future care needs. Appellants do not contest Mr. Bunin's professional and/or expert qualifications. Since we have rejected the argument that Nurse Parisi's testimony was inadmissible, we need not consider further Appellants' argument regarding the inadmissibility of Mr. Bunin's testimony.

    b. **Appellants are not entitled to judgment n.o.v. or molding of the verdict to remove future medical expenses.**

Appellants assert that they are entitled to judgment n.o.v. or molding of the verdict to remove the improper future medical expenses award. This claim fails.

To succeed on a claim of future medical expenses, a plaintiff must establish (1) the existence of a continuing injury, (2) a need for future care, and (3) the reasonable estimated cost of such care or, alternatively, that there is a reasonable basis to believe that the care to be rendered in the future will be the same as past care when the costs of past or current care have been established. (Pratt, *supra*).

In the instant matter, Appellee's amputated leg is a permanent, continuing injury that will need future care. She will require future care, for instance, to have specialists monitor her stump for potential complications, to buy medical supplies like medication and replacement equipment and prosthetics, and to have home health aides assist her in daily activities like moving around her house or performing hygiene-related tasks. (See generally N.T. 12/3/15 at 49-50.) Nurse Parisi also explained at length the basis for her reasonable estimates of the costs Appellee is likely to incur. She specifically explained the basis for each itemized estimate in her report, like expense tables used as standard industry references for finding cost estimates of care or equipment in Appellee's geographic region, survey research, and information published by Medicare and medical insurance companies.

Appellee met her burden of proof for future medical expenses. Thus, Appellants are not entitled to judgment n.o.v. or molding of the verdict to strike the future medical expenses award.

### c. Furthermore, Appellants' argument that Mr. Bunin did not reduce his economic projections to "present value" fails.

Appellants further argue that they are entitled to a molding of the verdict to reduce the award to "present value." This claim is meritless.

26

40 P.S. § 1303.509(b)(1) states that "future damages for medical and other related expenses shall be paid…after payment of the proportionate share of counsel fees and costs *based upon the present value of the future damages awarded* pursuant to this subsection" (emphasis added). However, Appellee correctly notes that the next subsection specifically permits "any future medical expense award adjustment to account for reasonably anticipated inflation and medical care improvements as presented by competent evidence." 40 P.S. § 1303.509(b)(2). Mr. Bunin specifically explained on the stand that he made his economic projections in light of "either inflation or medical improvements, known as medical inflation…on a year-by-year basis and project [those costs] out for the rest of [the patient's] life time." (N.T. 12/2/15 at 146-47.) He walked the trial court through his use of inflation rates and method of calculation for his economic forecasts. Because Mr. Bunin offered competent testimony and adjusted his predictions "to account for reasonably anticipated inflation and medical care improvements," his testimony was not improper under 40 P.S. § 1303.509(b)(2). Thus, Appellants are not entitled to relief on this basis.

7. **The trial court did not err or abuse its discretion in allowing Appellee to present a claim for past lost wages, or in refusing to mold the past lost wages award.**

Appellants assert that the trial court erred and abused its discretion in admitting Appellee's trial testimony without Appellee having provided pay stubs or tax returns. We disagree.

As always, admission of testimony is within the sound discretion of the trial court. Spino v. John S. Tilley Ladder Co., 671 A.2d 726, 734 (Pa. Super. Ct. 1996). In the instant matter, Appellants argue that Appellee's testimony of her past lost wages on the stand was unduly speculative and thus inadmissible. Here, Appellee specifically testified at trial about the nature of her job as a banquet server (N.T. 11/30/15 at 164-65), that up until the time of her surgery she was working approximately five hours a night according to seasonal demand for banquet servers (id.

27

at 166-67), and that she received fifteen percent of the tip plus a set pay, totaling around $18,000 annually (id. at 167).

Thus, following Pratt, Appellee gave sufficient admissible evidence of her past lost wage claim to permit it to go to the jury. Appellants are incorrect by stating that the court abused its discretion by ruling otherwise. The court did not err or abuse its discretion in denying Appellants' motions for nonsuit and directed verdict on this claim.[14]

Furthermore, Appellants argue alternatively that the $127,000 past lost wages award should be molded to $90,000. A trial court's refusal to mold the verdict is subject to an abuse of discretion standard; however, the court may only mold to conform the verdict to the jury's intent when that intent is clear. Herbert v. Parkview Hosp., 854 A.2d 1285, 1288 (Pa. Super. Ct. 2004) (citations omitted). If the jury's intent is "far from obvious," the verdict should be returned to the jury for further deliberation or a new trial should be granted. Id. Verdicts which are technically correct in form but which manifest a clear intent on the part of the jury may be corrected without resort to further jury deliberations or the grant of a new trial. Mirizio v. Joseph, 4 A.2d 1073, 1088 (Pa. Super. Ct. 2010) (citation omitted). A plaintiff is not required to quantify damages with mathematical certainty; there must merely be a "reasonable basis" for a jury to calculate the pecuniary loss. Vrabel, 844 A.2d at 601.

---

[14] Appellants also make much of Appellee's alleged stonewalling during discovery by refusing to answer discovery requests for the pay stubs or tax returns. As they note in their brief, a trial court may impose sanctions in such circumstances. (Appellants' Br. 62.) However, as Appellee notes in her brief, Appellants never moved for sanctions, moved to compel discovery on those items, or subpoenaed the tax returns. (Appellee's Br. 32-33.) Furthermore, Appellants were made aware of Appellee's likely trial testimony ahead of time when they heard similar testimony during her deposition. We note that "the purpose of the discovery rules is to prevent surprise and unfairness and to allow a fair trial on the merits." McGovern v. Hosp. Serv. Ass'n of Ne. Pa., 785 A.2d 1012, 1015 (Pa. Super. Ct. 2001) (citations omitted). Appellants suffered minimal surprise or unfairness, if any, when they were made aware in discovery of the facts they wished to verify and when they had the opportunity to seek court orders for the verification. Appellants do not explain their failure to do so.

28

Here, the verdict sheet unequivocally shows that the jury's intent was to award $127,000 in past lost wages, as the jury members filled that number in the blank for "past lost wages." Appellee testified at trial that she made $18,000 per year, and "sometimes more," as a seasonal banquet server. (N.T 11/30/15 at 167.) Furthermore, she collected unemployment benefits sporadically throughout the year when work opportunity waned. (Id. at 166.) It is clear that the jury simply believed that the $18,000 per year estimate was conservative in light of her testimony that she "sometimes made more," and they clearly believed she would have made more had she not been unable to work due to Appellants' malpractice. Thus, this claim is meritless.

8. **The trial court did not err or abuse its discretion in refusing to mold or grant remittitur for the jury's award of past care costs.**

Appellants argue that this Court erred and abused its discretion by refusing to mold the verdict award for past care costs according to their amount stipulation of $62,227.21 or to grant remittitur. These claims fail.

It is well-established that stipulations are subject to contracts-law analysis so that the intent of the parties controls. Tindall v. Friedman, 970 A.2d 1159, 1165 (Pa. Super. Ct. 2009) (citation omitted). The stipulation in question was an oral agreement made on the record in a chambers conference. Appellants imply that this alleged stipulation constricted the jury, if they awarded past care costs, to award no more than the stipulated amount. However, the record does not reflect that this was either the express agreement or the intent of the parties.

The defense stipulated "that the numbers [of $62,227.21] are accurate and were reasonable and necessary for the services that were provided." (N.T. 12/7/15 at 6.) Indeed, defense counsel emphasized that the stipulation was intended to be narrow, as he specifically commented two separate times that they were not stipulating as to causation. (Id.; id. at 8.) The effect of such a stipulation was to establish merely that no *further* proof of value and necessity was *required*.

29

Furthermore, the parties specifically agreed on a jury charge that would only state the dollar amount the plaintiff was seeking (id. at 25); the parties did not agree to, and neither did the Court actually, charge the jury that they were limited to finding this amount. The Court's instruction was, "The plaintiff is entitled to be compensated in the amount of all past medical expenses reasonably incurred for the diagnosis, treatment and cure of her injuries in the past. These expenses as alleged by the plaintiff are in the amount of $62,227.21. If you so find, this verdict should be recorded as a single amount." (Id. at 97-98.) Had the intent of the parties been to use the stipulation to limit the award, they could have explicitly agreed to do so. Furthermore, the verdict sheet's mention of past care costs only included a blank for the jury to fill in whatever award amount they wished. If the parties wished to limit the award amount, they could have accordingly designed the verdict sheet so as to limit the jury's input.[15]

The jury's award of $81,895.00 additionally does not merit remittitur, as it is only roughly $20,000 apart from the stipulated award and thus does not "shock the conscience" in view of the injuries sustained and amount of medical care received.

### 9. The trial court did not err or abuse its discretion in permitting testimony concerning Appellee's right leg.

Appellants argue that Appellee presented a time-barred claim that was at variance with her pleading, and that she failed to amend the original Complaint at any point. Appellee counters that this is essentially a question of damages and states that Appellants were on notice of all relevant claims. We agree with Appellee.

---

[15] Additionally, Appellee contends in her response to Appellants' post-trial motion that the language of the dialogue itself did not constitute an agreement or stipulation. This interpretation of the dialogue is plausible and perhaps probable, although our analysis above is sufficient for 1925(a) purposes without discussing this question. (See Appellee's Ans. in Opp. at 48-50; N.T. 12/7/15 at 24-26.)

Appellants argue that the Complaint only contains allegations concerning right knee healing and a right knee infection following the December 10, 2010 surgery, up to and including the April 17, 2011 hospitalization. They claim Appellee essentially did not raise any allegation of injuries to the right knee until the 2015 filing of Dr. Shall's expert report.

However, as Appellee observes, Pennsylvania is a notice pleading state. The plaintiff is required only to cite in the complaint the "material facts on which a cause of action is based." Pa. R.C.P. 1019. She was not required to plead every conceivable fact that would be presented at trial before the discovery phase began. The Complaint specifically and generally mentions that Appellee's damages include ongoing injuries to the right leg. (Compl. ¶ 68, "Annabelle Glasgow will continue to require treatment for her right sided below the knee amputation;" ¶ 69 "As a direct and proximate result of the defendants negligence plaintiff Annabelle Glasgow has sustained severe and disabling injuries including but not limited to infection, amputation of the right leg below the knee....") The fall was one of myriad injuries pleaded in the Complaint resulting from the original left leg medical concerns, of which Appellants were patently aware. The Complaint belies Appellants' contention that they were not on notice of any damages alleged involving the right knee until 2015. Any variance that could be construed to exist between the Complaint and theories presented by Appellee at trial thus did not prejudice the defense. See Rachlin v. Edmison, 813 A.2d 862, 871 (Pa. Super. Ct. 2002) (*en banc*). Thus, we find this claim meritless.

**10. The trial court did not err or abuse its discretion in its treatment of damages.**

> **a. The jury's verdict was not against the overwhelming weight of evidence or based wholly on sympathy and prejudice.**

Appellants contend that the verdict was against the overwhelming weight of evidence, and thus must have been the result of prejudice or sympathy from the jury. They base this argument on their assertions that the testimonies of Dr. Shall, Dr. Bonfiglio, Nurse Parisi, and Mr. Bunin

31

were inadmissible and insufficient to support the verdict. For the reasons set forth at length above, these contentions fail.

**b. The court did not err in denying Appellants' motion for remittitur or new trial or new trial on damages.**

Appellants contend that remittitur and/or a new trial on damages is appropriate. We disagree.

As stated above, review of a trial court's denial of a new trial is limited to determining whether the court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. If there is any support in the record for the denial of a new trial, the decision must be affirmed. The appellate court considers whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Braun v. Target Corp., 983 A.2d at 759-60.

For the reasons stated above, the trial court did not act capriciously, abuse its discretion, or commit an error of law that controlled the outcome of the case pertaining to damages. The reasoning for the damages calculations were set forth above, and there is no evidence that a new trial would produce a different verdict. Thus, a new trial on damages is unwarranted.

The decision to grant or deny a motion for remittitur is within the sound discretion of the trial court. Vogelsberger, 903 A.2d at 555. Remittitur will be affirmed on appeal absent an abuse of discretion or manifest error of law. Smalls, 843 A.2d at 413. Grant of remittitur is appropriate only when the award was "plainly excessive and exorbitant" (Haines, 640 A.2d at 369), and "so grossly excessive as to shock our sense of justice" (Powell, 457 A.2d at 1308).

When determining if a damages award merits remittitur, courts look to considerations including the severity of the injury, the physical manifestation of the injury, the permanence of the effect on the plaintiff, the plaintiff's future employability, the plaintiff's out-of-pocket expenses,

32

and the amount originally demanded in the complaint. Doe v. Raezer, 664 A.2d 102, 105 (Pa. Super. Ct. 1995) (citations omitted). These factors have all been discussed at length herein and show that the damages were reasonable and proportionate to the plaintiff's injuries and the effect on her future lifestyle and capabilities. The damages were therefore not "plainly excessive" or "exorbitant" so as to "shock the conscience." Thus, remittitur is not warranted.

## 11. The trial court did not err in its treatment of delay damages.

### a. Recent case law has rejected out-of-hand Appellants' argument that delay damages cannot be applied to awards of future medical expenses.

Appellants asserts that delay damages are not permitted for awards for future care and related expenses. This argument fails.

A trial court's ruling on delay damages will lie absent an abuse of discretion. Shamnoski v. PG Energy a Div. of South. Union Co., 765 A.2d 297, 305 (Pa. Super. Ct. 2000) (citation omitted). Delay damages are a form of pre-judgment interest designed to compensate a plaintiff for delay in receiving the monetary damages owed as a result of a defendant's tort, and serve to indemnify the plaintiff for the money which he or she would have earned on the award had he or she promptly received it. Laudenberger v. Port Auth. of Alleghency Cnty., 436 A.2d 147, 154 (Pa. 1981), app. dismissed, 456 U.S. 940 (1982). The governing rule states in relevant part:

> At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury...and shall become part of the verdict, decision or award.

Pa. R.C.P. 238(a)(1). Damages for delay shall be calculated at a rate equal to the prime interest rate and time shall be excluded when applicable. Pa. R.C.P. 238(a)(3).

The Superior Court explicitly held, earlier this year, that delay damages on awards of future medical expenses are perfectly permissible under Rule 238. Tillery v. Children's Hosp. of Phila.,

33

156 A.3d 1233, 1249-50, 1250 n.9 (Pa. Super. Ct. 2017) ("Because future medical expenses are compensatory damages...future medical expenses that will be incurred as a result of treatment of injuries sustained because of defendant's negligence are, by definition, monetary relief for bodily injury under the Rule's plain meaning.... [T]he fact that the damages are for future medical expenses not yet incurred, does not preclude the addition of delay damages to the award.") See also Roth v. Ross, 85 A.3d 590, 594 (Pa. Super. Ct. 2014) (citing cases permitting delay damages on awards for future medical expenses). Appellants' argument to the contrary is incorrect.

b. **Appellants also fail in their contention that they were entitled to calculation of the damages based on the present value of the award or the cost of the funding instrument as the expenses accrue and become payable.**

Appellants take issue with the fact that the delay damages were imposed on the future care costs award as given by the jury. The future care costs, as discussed in Discussion Part 6(c), *supra*, properly accounted for inflation. Appellants argue that, if this Court found Appellants liable for delay damages on the future care award, those delay damages should only have been based on a future costs calculation that did *not* account for inflation, i.e. a future costs calculation at present value.

We again look to Tillery, which held that "future medical expenses are only to be reduced to present value for the purpose of calculating attorney fees and costs." Id. at 1248-49. Appellants maintain that this rule, despite its explicit limitation, should be expanded to include the calculation of delay damages. Appellants cite no case law supporting this theory, and this Court is not aware of any precedent requiring us to deviate from the Tillery rule establishing a single basis for reduction to present value. Furthermore, the Rule text states that delay damages "shall be added to the amount of compensatory damages" and "shall become part of the verdict." Pa. R.C.P 238(a)(1).

34

Appellants further offer a curious reading of the Act's payment clause and precedent in an attempt to avoid paying the delay damages award in a lump sum. Appellants interpret a quote from case law (Frey v. Harley Davidson Motor Co., Inc., 734 A.2d 1, 12 (Pa. Super. Ct. 1999)), "defendants are…responsible for the payment of delay damages in the same manner as the underlying verdict," to mean that the delay damages must be considered payable in the exact same fashion as the rest of the verdict award. Since the verdict award contains future medical expenses which can only be paid in installments as they accrue, they argue that the delay damages must be considered payable in the same manner – i.e. in installments. This argument ignores the fact that the delay damages amount is definite and has already accrued, whereas the total future medical expenses award is presently indeterminable.

Firstly, we disagree with this understanding of "responsibility for the payment of delay damages in the same manner as the underlying verdict;" in fact, paying the delay damages in lump sum form is, indeed, paying them in the same manner as the underlying verdict. The delay damages award amount without the future medical expenses was due as soon as it was accrued, which occurred at the entry of judgment on July 20, 2016. The future medical expenses will be due as soon as they have accrued. The delay damages award is not being treated any differently than the rest of the award amount.

Secondly, we note that Frey v. Harley Davidson is easily distinguished from the instant matter. The Superior Court in that case simply held that the defendants should be held jointly and severally liable for delay damages, since they were held jointly and severally liable for the rest of the damages. Id. at ¶ 32. This is clearly inapposite to the instant matter. We also note that this (along with the Act's text) is the full extent of Appellants' alleged legal support for their argument.

35

Thirdly, we note that this reading does not stand up to logical scrutiny. If Appellants' argument were correct, then defendants in *all* cases involving awards for future medical expenses would not be required to pay *any* damages of any kind except as future medical expenses were incrementally accrued. The legislators of the MCARE Act clearly did not intend or anticipate such an absurd consequence.

## CONCLUSION

For the foregoing reasons, we respectfully ask the Superior Court to affirm the trial court's rulings as discussed herein.

BY THE COURT:

Rosalyn K Robinson

DATE:

6-29-2017

36